# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF CALIFORNIA

MARIAM A. SALAH,                          CASE NO.  1:05-cv-01084 TAG

     Plaintiff,                          MEMORANDUM DECISION AND ORDER
                                                        ON PLAINTIFF'S APPEAL FROM
  vs.                              ADMINISTRATIVE DECISION

JO ANNE B. BARNHART,                     ORDER DIRECTING THE CLERK TO
Commissioner of Social Security,         ENTER JUDGMENT IN FAVOR OF
                                                     DEFENDANT AND AGAINST PLAINTIFF
     Defendant.

_____/

     Plaintiff Mariam A. Salah ("claimant" or "plaintiff") seeks  judicial review of an administrative decision denying her claim for Supplemental Security Income under Title XVI of the Social Security Act, 42 U.S.C. § 1381 et seq.  Pending before the Court is claimant's appeal from an administrative decision of the Commissioner of Social Security ("Commissioner").  Claimant filed her complaint on August 12, 2005 (Doc. 2), and her opening brief on January 21, 2006.  (Doc. 13).  The Commissioner filed her opposition on February 22, 2006 (Doc. 14). Claimant did not file a reply brief.

     Pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, the parties consented to proceed before a United States Magistrate Judge.  (Docs. 9 and 12).  By an order dated March 24, 2006, this action was assigned to the United States Magistrate Judge for all further proceedings.  (Doc. 15).

## JURISDICTION

     On April 29, 2002, claimant protectively filed[1] an application for Supplemental Security Income.  (Administrative Record ("AR") 121-26).  Claimant's application was denied initially

---

[1]  To qualify as an effective Supplemental Security Income claim, an application for benefits must be submitted on a prescribed form.  20 C.F.R. § 416.305.  However, a written statement indicating a person's intent to claim benefits can, if certain coincident and subsequent requirements are met, establish a protective filing date.  20 C.F.R. § 416.340.

(AR 86-89) and on reconsideration (AR 91-94).  At an administrative hearing on October 29, 2003, claimant appeared without counsel, but expressed a desire to proceed with an attorney and with an Arabic interpreter, whereupon the hearing was terminated.  (AR 377-86).  A rescheduled hearing was held on March 17, 2005, with an interpreter present but not used, and still without counsel. (AR 324-76).  Subsequent to the hearing, Administrative Law Judge ("ALJ") Michael J. Haubner found that claimant was not disabled in a written determination dated April 15, 2005.  (AR 15-21). The Appeals Council denied claimant's request for review on June 23, 2005 (AR 5-7), leaving the ALJ's decision of April 15, 2005, as the final decision of the Commissioner.  On August 12, 2005, within 60 days of the Appeals Council decision, claimant timely appealed to the district court pursuant to 42 U.S.C. § 405(g).  (Doc. 2).

## STATEMENT OF FACTS

**1.     Claimant's Testimony**

Claimant was born on November 22, 1954, making her 50 years old at the time of the administrative hearing before ALJ Haubner.  (AR 121, 324, 337).  At that hearing, claimant testified that she had graduated from high school in Jordan and had taken some community college courses (English, mathematics, computers and typing) at Madera Community College and Fresno City College.  (AR 338).  Regarding her employment history, claimant testified that she had performed the following work:

o     1988-1990 - 10 hours a week as a cashier for her husband's business.  (AR 339).

o     1990-1991 - 30 hours a week as a manager of her husband's check cashing business. (AR 340-41).

o     1994-1998 - 40 hours a week as manager of her husband's clothing business (AR 341-42), including responsibility for stocking the business during 1997 to 1998.  (AR 342).

o     2000-2004 - Unspecified number of hours working for her mother in "home supportive service."  (AR 343-344).

As to her medical condition, claimant testified that her disability stems from back problems as well as right and left arm problems.  (AR 361).  She testified to constant pain in her back (which she rated at "6" to "8" on a scale of 1 to 10), constant pain in her right shoulder (which she rated at

"8" on a scale of 1 to 10), and constant pain in her left shoulder (which she rated at "8" on a scale of 1 to 10). (AR 356-57, 362). Advised by the ALJ of medical records stating that she had "left ulnar neuropathy . . . problems with your left arm," claimant nevertheless confirmed that both her right and left arms hurt. (AR 361). Claimant testified that she could stand for no longer than 10 to 15 minutes at a time, could sit for no longer than 20 minutes at a time and could lift only one pound with her right hand and less than nine pounds with her left hand. (AR 359-60).

As to her daily life activities, claimant testified that she lives in an apartment with her 72-year old mother and 20-year old daughter. (AR 346-47). Claimant stated that she feeds herself, dresses herself (but requires help several times a week), bathes herself, does simple meal preparation by herself, does her dishes daily, and goes to a laundry every two weeks. (AR 350-52). Claimant also testified that she drives her car four times a week, shops at the market four or five days a week, sweeps her apartment every three days, vacuums weekly, mops the floors weekly and wipes the windows weekly. (AR 352-53). Claimant testified that she also watches television (two hours daily), walks (10 to 15 minutes daily), but spends several hours in bed each day (over the course of four or five different rest periods) due to fatigue and pain in her back and shoulder. (AR 355-56).

**2.    Claimant's Medical Records**

The administrative record reflects that claimant's long-time treating physician was Sohaila M. Mojadaddi, M.D. (AR 232-74). On July 31, 2001, according to Dr. Mojadaddi's records, claimant was referred for x-rays of her lumbar spine due to a history of "[l]ow back pain." (AR 265). However, the x-rays showed no abnormalities and the reported diagnostic impression was "[n]ormal lumbar spine." (Id..)

Also in 2001, claimant was seen by Cyril W. Rebel, M.D., an orthopedic surgeon, for treatment of her complaints of left shoulder and arm pain. On December 12, 2001, Dr. Rebel wrote to Dr. Mojadaddi that claimant's pain-related complaints had not responded to the usual treatment, including injection treatment and medications. (AR 192). He also noted that he had physically

examined claimant, had ordered an MRI scan and had ordered an X-ray[2], but that all such tests (exam, MRI and X-ray) were normal.  (Id.)  Specifically, Dr. Rebel stated that "I cannot find any orthopaedic pathology to correlate with the severity of her pain."  (Id.)

Apparently at Dr. Rebel's suggestion (AR 192), claimant was referred by Dr. Mojadaddi to Asela P. Jumao-As, M.D., a neurologist, who performed an EMG and nerve conduction study upon claimant on March 26, 2002.  (AR 17, 227).  The study revealed "left ulnar neuropathy at the elbow; probable brachial plexopathy with involvement of the left axillary nerve and left musculocutaneous nerves."  (AR 227).  In a history taken on March 18, 2002, claimant attributed her left shoulder pain to having been "beaten up" and pushed onto her left side on a couch, during which her left arm was twisted.  (AR 230).

On October 8, 2002, x-rays again were taken of claimant's lumbar spine, this time due to a stated history of "lumbar spine strain." (AR 260).  The diagnostic impression was "multilevel degenerative changes."  (Id.)  Dr. Mojadaddi ordered outpatient physical therapy for claimant, for which she undertook 13 visits through January 29, 2003.  (AR 312).  However, claimant was discharged from such treatment on March 6, 2003 because she "failed to show for more appointments" beyond her last visit on January 29, 2003.  (Id.)

On March 28, 2003, claimant was treated at the Madera Community Hospital Emergency Room due to a auto accident.  (AR 307).  Notes from that visit indicate that claimant was restrained, that the vehicular speed was slow, and that damage to the vehicle was minor.  (Id.)  At the emergency room, claimant reported neck and mid-back pain and abdominal pain.  (Id.)

On April 11, 2003, a CT scan was taken of claimant's lumbar spine in light of her reported history of low back pain.  (AR 301).  The scan showed "[n]o evidence of acute fracture or dislocation," "multilevel degenerative changes" and "mild spinal stenosis at L3-L4 and L4-L5."  (Id.)

On May 8, 2003, claimant was evaluated by Cynthia Marquez, P.T., a physical therapist at Madera Community Hospital.  (AR 298-300).  The reported impressions from this evaluation were

---

[2]  The x-ray appears to have been a June 27, 2001 image of claimant's left shoulder.  (AR 184).  Impressions based upon this x-ray were that claimant had mild early degenerative changes in the glenohumeral articulation, but that there were no erosive changes and no changes in the acromioclavicular joint.  (Id.)

that claimant had "moderate difficulty with bed mobility and dressing secondary to her pain symptoms" and, in terms of her range of motion, that claimant's upper extremity range of motion "is within normal limits with pain symptoms over the right medial scapular region and thoracic region with full shoulder flexion and abduction." (AR 299).  A further reported impression was that claimant's lumbar range of motion was limited to 25% in all planes secondary to pain symptoms. (Id.)  Physical therapy sessions at a rate of twice weekly for four weeks were ordered.  (AR 300). By July 1, 2003, all eight physical therapy sessions had been completed.  (AR 297).  It was noted at the time that claimant showed good lumbar strengthening and experienced temporary relief in pain symptoms, but that she was unable to consistently maintain intact pelvic symmetry.  (Id.)

On September 15, 2003, claimant was referred by Dr. Mojadaddi to Henry Ho Kang, M.D. for evaluation.  (AR 296).  An x-ray of the lumbosacral spine and pelvis was taken and showed "abnormal picture of L5 spinous process attached to the pelvis and second." (Id.)  Dr. Kang's assessment was that claimant had "[c]hronic low back pain with discogenic disease, facet arthropathy, sacrolitis.  Bilateral shoulder pain with bursitis and tendonitis." (Id.)  He instructed claimant to wear soft, cushioned shoes, to apply a moist wet hot pack for 30 minutes several times a week, to do an exercise program five days a week, and to hold her old medicines (Bextra, Prevacid, Soma, Vicodin and Xanex).  (Id.)

On February 14, 2004, claimant was consultatively examined by Benjamin Chang, M.D. (AR 287-90).  Claimant's chief complaints as stated to Dr. Chang were chronic low back pain and left shoulder pain.  (AR 287).  Upon examination, Dr. Chang's general findings were that there was "a positive impingement test with the left shoulder.  There was mild tenderness on palpation over the lower lumbar spine, but no spasm, crepitus, effusion, or deformities." (AR 289).  His diagnosis was "[c]hronic low back pain, likely from degenerative disk disease and muscle strain" and "[l]eft shoulder pain, rule out impingement syndrome." (AR 290).  As to claimant's residual functional capacity, Dr. Chang concluded that claimant could be expected to stand, walk, and sit for about six hours in an eight-hour workday with normal breaks, and further that she could be expected to lift 10 pounds frequently and 20 pounds occasionally, with only occasional overhead lifting with her left

1  upper extremity.  (Id.)[3]

2  ## SEQUENTIAL EVALUATION PROCESS

3       The Social Security Act defines "disability" as the "inability to engage in any substantial

4  gainful activity by reason of any medically determinable physical or mental impairment which can be

5  expected to result in death or which has lasted or can be expected to last for a continuous period of

6  not less than twelve months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  The Act also provides

7  that a claimant shall be determined to be under a disability only if her impairments are of such

8  severity that claimant is not only unable to do her previous work but cannot, considering claimant's

9  age, education and work experiences, engage in any other substantial gainful work which exists in

10  the national economy.  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

11       The Commissioner has established a five-step sequential evaluation process for determining

12  whether a person is disabled.  20 C.F.R. §§ 404.1520, 416.920.  Step one determines if she is

13  engaged in substantial gainful activities.  If she is, benefits are denied.  20 C.F.R. §§ 404.1520(b),

14  416.920(b).  If she is not, the analysis proceeds to step two, which considers whether claimant has a

15  medically severe impairment or combination of impairments.  20 C.F.R. §§ 404.1520(c), 416.920(c).

16       If claimant does not have a severe impairment or combination of impairments, the disability

17  claim is denied.  If the impairment is severe, the evaluation proceeds to the third step, which

18  compares claimant's impairment with a number of listed impairments acknowledged by the

19  Commissioner to be so severe as to preclude substantial gainful activity.  20 C.F.R. §§ 404.1520(d),

20  416.920(d); 20 C.F.R. § 404 Subpt. P App. 1.  If the impairment meets or equals one of the listed

21  impairments, claimant is conclusively presumed to be disabled.  If the impairment is not one

22  conclusively presumed to be disabling, the evaluation proceeds to the fourth step, which determines

23  whether the impairment prevents claimant from performing work she has performed in the past.  If

24  claimant is able to perform her previous work, she is not disabled.  20 C.F.R. §§ 404.1520(e),

25  416.920(e).  If claimant cannot perform this work, the fifth and final step in the process determines

26

27       [3] Although not developed as an issue on appeal, claimant also reported being depressed.  (AR 236, 240, 255).
However, the administrative record does not reveal any referral for this issue to a psychiatrist or psychologist.  (AR 16).
Notwithstanding, a mental status examination was performed by Charles House, Ph.D. on January 29, 2004.  (AR 279-

28  86).  Dr. House diagnosed depressive disorder, NOS [not otherwise specified].  (AR 285).

1  whether she is able to perform other work in the national economy in view of her age, education and

2  work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f). See Bowen v. Yuckert, 482 U.S. 137

3  (1987).

4          The initial burden of proof rests upon a claimant to establish a *prima facie* case of entitlement

5  to disability benefits. Rhinehart v. Finch, 438 F.2d 920, 921 (9th Cir. 1971). In terms of the five

6  step sequential evaluation process, the Ninth Circuit has held that "[t]he burden of proof is on the

7  claimant as to steps one to four," while at the same time noting that an ALJ's "*affirmative duty* to

8  assist a claimant to develop the record . . . complicates the allocation of burdens" such that "the ALJ

9  shares the burden at each step." Tackett v. Apfel, 180 F.3d 1094, 1098 & n.3 (9th Cir. 1999)(italics

10  in original). The initial burden is met once a claimant establishes that a physical or mental

11  impairment prevents her from engaging in her previous occupation. The burden then shifts to the

12  Commissioner to show (1) that the claimant can perform other substantial gainful activity and (2)

13  that a "significant number of jobs exist in the national economy" which claimant can perform. Kail

14  v. Heckler, 722 F.2d 1496, 1498 (9th Cir. 1984).

15                    **STANDARD OF REVIEW**

16          Congress has provided a limited scope of judicial review of a Commissioner's decision. See,

17  42 U.S.C. § 405(g). A court must uphold the Commissioner's decision, made through an ALJ, when

18  the determination is not based on legal error and is supported by substantial evidence. See, Jones v.

19  Heckler, 760 F.2d 993, 995 (9th Cir. 1985); Sanchez v. Secretary of Health & Human Services, 812

20  F.2d 509, 510 (9th Cir. 1987) (two consulting physicians found applicant could perform light work

21  contrary to treating physician's findings). "The [Commissioner's] determination that a claimant is

22  not disabled will be upheld if the findings of fact are supported by substantial evidence." Delgado v.

23  Heckler, 722 F.2d 570, 572 (9th Cir. 1983) (*citing* 42 U.S.C. § 405(g)). Substantial evidence is more

24  than a mere scintilla, Sorenson v. Weinberger, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975), but less

25  than a preponderance. McAllister v. Sullivan, 888 F.2d 599, 601-602 (9th Cir. 1989); Desrosiers v.

26  Secretary of Health and Human Services, 846 F.2d 573, 576 (9th Cir. 1988). Substantial evidence

27  "means such evidence as a reasonable mind might accept as adequate to support a conclusion."

28  Richardson v. Perales, 402 U.S. 389, 401 (1971) (citations omitted). "[S]uch inferences and

7

conclusions as the [Commissioner] may reasonably draw from the evidence" will also be upheld. Mark v. Celebrezze, 348 F.2d 289, 293 (9th Cir. 1965).  On review, the court considers the record as a whole, not just the evidence supporting the decision of the Commissioner.  Weetman v. Sullivan, 877 F.2d 20, 22 (9th Cir. 1989) (quoting Kornock v. Harris, 648 F.2d 525, 526 (9th Cir. 1980)).

It is the role of the trier of fact, not this Court, to resolve conflicts in evidence.  Richardson, 402 U.S. at 400.  If evidence supports more than one rational interpretation, the Court must uphold the decision of the ALJ.  Allen v. Heckler, 749 F.2d 577, 579 (9th Cir. 1984).  Moreover, if there is substantial evidence to support the administrative findings, or if there is conflicting evidence that will support a finding of either disability or nondisability, the finding of the Commissioner is conclusive.  Sprague v. Bowen, 812 F.2d 1226, 1229-1230 (9th Cir. 1987).  Nevertheless, a decision supported by substantial evidence will still be set aside if the proper legal standards were not applied in weighing the evidence and making the decision.  Brawner v. Secretary of Health and Human Services, 839 F.2d 432, 433 (9th Cir. 1987).

## ALJ'S FINDINGS

**Step One**

The ALJ found at step one that claimant "has not engaged in substantial gainful activity since the alleged onset of disability."  (AR 20).

**Step Two**

At step two, the ALJ found that claimant's "left upper extremity ulnar neuropathy, brachial and plexopathy and degenerative disc disease of the lumbar spine" were "severe" impairments.  (AR 20).

**Step Three**

At step three, the ALJ assessed whether claimant's impairments were among those acknowledged by the Commissioner to be so severe as to preclude substantial gainful activity.  See 20 C.F.R. § 416.920(d); 20 C.F.R. Pt. 404, Subpt. P, App. 1 (Listing of Impairments).  The ALJ concluded that claimant's impairments did not meet or equal any of the listed impairments.  (AR 20).

///

///

**Step Four**

At step four, upon stating that claimant had the residual functional capacity ("RFC") to lift and carry 20 pounds occasionally (10 pounds frequently), could stand, walk and sit for six hours, and could occasionally push, pull and lift overhead with both extremities, the ALJ concluded that claimant was unable to perform her past relevant work.  (AR 20).

**Step Five**

At step five, and in reliance on vocational expert testimony consistent with the RFC listed above, the ALJ determined that "there are a significant number of jobs in the national economy that she could perform."  (AR 21).  These included photo salesperson (115,000 positions in California and 1,150,000 nationally), cashier (60,435 positions in California and 604,350 nationally) and 30 percent of the world of unskilled light work.  (AR 20).  Accordingly, the ALJ concluded that claimant was not under a disability as defined in the Social Security Act.  (AR 21).

**ISSUES**

Claimant's Opening Brief raised the following issue for consideration:

1.  Whether the ALJ erred in rejecting the credibility and testimony of claimant.

2.  Whether the ALJ properly considered the evidence in determining claimant's residual functional capacity.

3.  Whether the ALJ's vocational finding was based upon substantial evidence in the record.

This Court must uphold the Commissioner's determination that claimant is not disabled if the Commissioner applied the proper legal standards and there is substantial evidence in the record as a whole to support the decision.

**DISCUSSION**

**1.     Claimant's Credibility**

Claimant asserts that ALJ Haubner failed to provide clear and convincing reasons for discrediting her testimony.  (Doc. 13, p. 8).  Had her testimony been properly credited, according to claimant, the scope of her residual functional capacity would have been more limited than as found by the ALJ, and she would have been restricted to sedentary work.  (Id.)

///

1    A two step analysis applies at the administrative level when considering a claimant's

2  subjective credibility.  Smolen v. Chater, 80 F.3d 1273, 1281 (9th Cir. 1996).  First, the claimant must

3  produce objective medical evidence of an impairment and show that the impairment could

4  reasonably be expected to produce some degree of symptom.  Id. at 1281-82.  If claimant satisfies

5  this test - and if there is no evidence of malingering - the ALJ can reject the claimant's testimony

6  about the severity of the claimant's symptoms "only by offering specific, clear and convincing

7  reasons for doing so."  Id. at 1281.  Such specificity is crucial so as to enable effective judicial

8  review.  See Mersman v. Halter, 161 F. Supp. 2d 1078, 1086 (N.D. Cal. 2001)("The lack of specific,

9  clear, and convincing reasons why Plaintiff's testimony is not credible renders it impossible for [the]

10  Court to determine whether the ALJ's conclusion is supported by substantial evidence"); SSR 96-7p

11  (the ALJ's decision "must be sufficiently specific to make clear to the individual and to any

12  subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for

13  that weight").

14    Here, upon first synopsizing claimant's visits with various physicians (AR 16-18),

15  ALJ Haubner noted numerous specific, clear and convincing reasons - all supported by substantial

16  evidence in the record - for discounting claimant's subjective complaints, and the supposed

17  limitations that went with them.  In concluding that "claimant's credibility is poor" (AR 18), ALJ

18  Haubner noted the following:

19    **I.**    Claimant had not received treatment consistent with chronic pain syndrome, such as

20  biofeedback, acupuncture, use of a Transcutaneous Electrical Nerve Stimulation ("TENS") unit or

21  attendance at a pain management clinic.  (AR 18).

22    **ii.**    Notwithstanding the degree of alleged pain, no physician had recommended surgery.

23  (AR 18).

24    **iii.**    Claimant had not been not entirely compliant in following through with her physical

25  therapy appointments and had cancelled or failed to show up for medical appointments on various

26  occasions, "which suggests that the symptoms may not have been as limiting as alleged."  (AR 18).

27  Among the missed-visits cited by ALJ Haubner were two appointments with Dr. Mojadaddi on

28  May 5 and June 14, 2002, and several physical therapy appointments in early 2003.  (AR 18, 239,

312).  As noted by the ALJ, claimant's failure to show for these physical therapy appoints caused her to be discharged from the physical therapy program itself.  (AR 18, 312).

iv.     During her testimony, claimant "tended towards exaggeration.  For example, she alleged she could only concentrate for two minutes at a time, but paid attention and responded appropriately throughout the one-hour-plus [sic] hearing."  (AR 19, 364).  As another example of exaggeration, the ALJ noted that "even though the claimant testified the longest she could sit at one time was 20 minutes, she sat through the entire [greater than one-hour] hearing even though I told her she could get up anytime."  (AR 19, 336, 360).  ALJ Haubner also noted that Dr. House, in reporting the results of a mental status examination of claimant, had also described possible exaggeration.  (AR 19, 281)(Dr. House's report states that "the probability of symptom exaggeration is significant").

v.      Finally, the ALJ noted a number of inconsistencies in claimant's statements, and between her statements and her conduct.  For example, while claimant told Dr. House that she was attending Fresno City College and studying to become a licensed vocational nurse (AR 281), she later denied any current schooling in testimony given at her administrative hearing.  (AR 18, 345). Likewise, the ALJ noted that claimant had told Dr. House that she stayed in bed as much as she could, but then reported daily activities which were unrestricted, activities which she repeated during her administrative testimony.  (AR 18, 281).

In light of the foregoing, the Court finds that ALJ Haubner sufficiently articulated a number of inconsistencies justifying his decision to discredit claimant's subjective complaints (and her corresponding view of her exertional capacity), and that these inconsistencies are well supported by substantial evidence in the record.  See Light v. Social Sec. Admin., 119 F.3d 789, 792 (9th Cir. 1997)("the ALJ may consider [claimant's] reputation for truthfulness, inconsistencies either in his testimony or between his testimony and his conduct, his daily activities, his work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which he complains"); Brawner, 839 F.2d at 433 (upon giving "great weight to [the] ALJ's credibility assessment," the court concluded that it was supported by substantial evidence). ///

**2.      Determination of Claimant's Residual Functional Capacity**

Claimant asserts that in determining her residual functional capacity ("RFC"), ALJ Haubner failed to consider (1) her facility with the English language and (2) the alleged side effects of her medications. (Doc. 13, pp. 9-11). As a consequence, according to claimant, the ALJ's RFC determination was insufficiently limited. (Doc. 13, p. 11).

In addressing these arguments, the Court first notes that claimant's ability to speak English is *not* an element of her RFC per se. A claimant's RFC assessment is a determination of "the most [an individual] can still do despite [his or her] limitations." 20 C.F.R. § 416.945(a). Factors considered in an RFC assessment involve physical abilities, 20 C.F.R. § 416.945(b), mental abilities, 20 C.F.R. § 416.945(c), and certain other medically determinable impairments such as skin impairments, epilepsy, and impairments of vision, hearing and other senses, 20 C.F.R. § 416.945(d).

Rather, the ability to speak English is a *vocational* factor that may be considered at step five of the sequential analysis, albeit in combination with a claimant's RFC, in order to determine whether a claimant can perform work in the national economy other than her past relevant work. 20 C.F.R. §§ 416.960(b)-(c), 416.964(b)(5) (ability to communicate in English is a vocational factor). Although not properly raised by claimant in such terms, it is evident that the ALJ not only inquired into the indicia of claimant's English-speaking ability at the administrative hearing, but also commented on her skills. Claimant was asked and responded to almost 300 questions during the hearing. (AR 337-76). She exhibited no difficulty in either comprehending or responding to the questions presented and never once asked for help from the interpreter who was present during the hearing. (Id.). Moreover, the ALJ observed that claimant spoke "wonderful English" and that he "barely even notice[d] an accent." (AR 339). Upon questioning, the ALJ also determined that claimant had taken computer and math classes in English (AR 338-39), had taken and passed her driver's license test in English (AR 347) and had taken and passed her U.S. citizenship test in English. (Id.) Given the record before him, the Court finds that ALJ properly declined to include claimant's English-speaking ability as a limiting vocational factor in his step five assessment. Cf. Brown v. Massanari, 231 F. Supp. 2d 1011, 1018 (D. Or. 2001)("The ALJ is required to include in his hypothetical only those limitations he finds credible, and supported by the record").

12

Claimant also asserts that the ALJ improperly excluded the side effects of "upset stomach, sleepiness, drowsiness [and] fatigue" caused by her medications.  (Doc. 13, p. 10).  However, claimant offers no objective evidence (other than citations in her brief to various drug-related web sites) of the degree to which her medications affected her stomach or caused fatigue.  The only evidence regarding these symptoms - to the extent there is any evidence at all - is claimant's own statements to her doctor and her testimony at the hearing, testimony which changed as claimant went along.  Indeed, while claimant at first stated that she had to lay down during the day due to fatigue (which the Court will assume, *arguendo*, was from the side-effects of medication, although this was not stated by claimant), she immediately changed the thrust of her answer to indicate that it was due to pain:

> "Q:     Okay.  So you're laying down because you're fatigued?
>
> A:      Oh, yeah, and pain, yes.  I'm in pain.  That's why - -"

(AR 356).  Addressing an identical argument based upon almost identical facts, the Ninth Circuit in Thomas v. Barnhart, 278 F.3d 947, 960 (9th Cir. 2002) stated the following, an analysis on all fours with the issue before this Court:

> "[Claimant] also claims that the ALJ improperly excluded the side effects of dizziness and difficulties in concentration caused by her pain medication.  Again, [claimant] offers no objective evidence that her medication affected her concentration or caused dizziness.  The only evidence regarding these symptoms is [claimant's] own statements to her doctor and her testimony at the hearing.  While [claimant's] testimony cannot be rejected solely because the objective medical evidence does not support the severity of her impairment, the ALJ properly rejected her testimony by using 'ordinary techniques of credibility evaluation' and providing a specific, clear and convincing reason, supported by the record, that her testimony was generally not credible. . . .  For example, the ALJ relied on [claimant's] demeanor at the hearing and found that 'she seemed to engage in considerable histrionic exaggeration.'"

Thomas, 278 F.3d at 960 (citations omitted, emphasis added).  Here, ALJ Haubner not only noted exaggeration by claimant (both at the hearing and as observed by at least one physician), but also a number of other clearly stated and convincing reasons why claimant's credibility was "poor." (AR 18).  Under these circumstances, and as with claimant's alleged limited ability to speak English, the ALJ's decision not to include a medication-related side-effect limitation in his RFC assessment

1   was well supported by substantial evidence in the record.  Cf. Brown v. Massanari, 231 F. Supp. 2d

2   1011, 1018 (D. Or. 2001)("The ALJ is required to include in his hypothetical only those limitations

3   he finds credible, and supported by the record").

4   **3.      Vocational Findings**

5       Claimant asserts various errors in connection with the ALJ's determination at step five of the

6   sequential analysis.  (Doc. 13, pp. 11-12).  These are addressed seriatim below.

7         **I.      Reliance on Medical-Vocational Guidelines**

8       Claimant contends that (1) the ALJ erred in relying on the Medical-Vocational Guidelines at

9   step five of the sequential analysis and that (2) the ALJ nevertheless cited and relied upon the wrong

10  section within them.  (Doc. 13, pp. 11-12).

11      The Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpt. P, App. 2 (also known as

12  "the Grids") facilitate administrative decision-making by "reduc[ing] four factors - residual

13  functional capacity, age, education, and work experience - to binary, 'yes/no' conclusions; the grids

14  then mandate a bright-line finding of disability or nondisability based upon the combination of these

15  four factors."  Chavez v. Bowen, 844 F.2d 691, 693 (9th Cir. 1988).  Beneficially, the Grids can serve

16  to "relieve the Secretary of the need to rely on vocational experts" in the course of the disability

17  determination.  Heckler v. Campbell, 460 U.S. 458, 461 (1983).

18      However, when the Grids do not adequately take into account a claimant's abilities and

19  limitations, they serve only as a framework, in which case resort to a vocational expert is still

20  required.  Thomas, 278 F.3d at 960 ("The Grids are used to determine whether substantial gainful

21  work exists for the claimant with respect to substantially uniform levels of impairment . . . . When

22  they do not adequately take into account claimant's abilities and limitations, the Grids are to be used

23  only as a framework, and a vocational expert must be consulted").

24      In the instant case, the Court finds that ALJ Haubner properly referenced the Grids only as a

25  framework, and that he went beyond the Grids by referencing and relying upon vocational expert

26  testimony in his disability determination.  As the ALJ wrote:

27      "I asked Ms. Najarian [the vocational expert] whether jobs exist in the national
    economy for an individual of the claimant's age, education, past relevant work

28      experience and residual functional capacity as determined.  She testified that given all

of these factors, such a person could work using the claimant's past relevant work skills, as a photo salesperson, with 115,000 positions available in California and 1,150,000 available nationally; a cashier, with 60,435 remaining positions available in California and 604,350 remaining available nationally; and 30% of the world of unskilled light work, with 200,000 remaining positions available."

. . .

"Although the claimant's non-exertional limitations do not allow her to perform the full range of light work, using Medical-Vocational Rule 202.21 as a framework, <u>in conjunction with the vocational expert testimony</u>, there are a significant number of jobs in the national economy that she could perform, as described above [by Ms. Najarian]."  (AR 20-21)(emphasis added).

The Court finds, however, that ALJ Haubner did not reference the correct Rule within the Medical-Vocational Guidelines.  Specifically, ALJ Haubner stated that the framework guideline used in his analysis was Rule 202.21.  (AR 21).  This rule applies to "younger individuals" and not to those "closely approaching advanced age" (<u>i.e.</u>, ages 50-54).  <u>See</u> 20 C.F.R. Part 404, Subpt. P, App. 2, Rules 202(d) and 202.21.  While claimant was a "younger individual" at the time of onset (AR 121), she was in a different class, "closely approaching advanced age," at the time of ALJ Haubner's decision.  It is at this point - the time of decision - at which claimant's age is relevant.  <u>See</u> <u>Russell v. Bowen</u>, 856 F.2d 81, 83-84 (9th Cir. 1988) (court determined the applicable grid by noting claimant's age at the time of the "final decision" of the Secretary); <u>Varley v. Secretary of Health & Human Services</u>, 820 F.2d 777, 780 (6th Cir. 1987)("the claimant's age as of the time of the decision governs in applying the regulations"); <u>Crook v. Barnhart</u>, 244 F. Supp. 2d 1281, 1283 (N.D. Ala. 2003)("For purposes of determining age under the grids, 'the claimant's age as of the time of the decision governs'")(<i>citing</i> <u>Varley</u>).

Notwithstanding this error, both Rule 202.21 (cited by the ALJ) and Rule 202.14 (applicable to those aged 50 to 54, but with the same additional limitations as those under Rule 202.21), dictate a finding of not disabled.  The ALJ's citation to the wrong rule under the Grids was therefore harmless error.  <u>Curry v. Sullivan</u>, 925 F.2d 1127, 1131 (9th Cir. 1991)(where same result ensues regardless of age, the harmless error rule applies)(<i>citing</i> <u>Booz v. Secretary of Health and Human Services</u>, 734 F.2d 1378, 1380-81 (9th Cir. 1984).

///

///

15

1          **ii.        Jobs Identified by Vocational Expert**

2          Claimant's final argument is that the vocational expert ("VE") failed to identify "appropriate"

3   skilled or semi-skilled jobs that claimant could perform given her limited RFC.  (Doc. 13, p. 12).

4   Specifically, Claimant avers that (1) there is nothing in the record to indicate that she could perform

5   "photo sales" or "china sales" jobs and that (2) a cashier job (which claimant previously performed)

6   requires constant reaching.  (Id.).

7          The Court finds that claimant's assertions are unfounded.  First, substantial evidence in the

8   record amply supports the VE's conclusion, as adopted by the ALJ, that claimant could perform

9   various sales clerk jobs, such as with respect to photo sales.  This specific job category, set forth at

10  Dictionary of Occupational Titles ("DOT") § 277.357-050, is semi-skilled (consistent with

11  claimant's educational level) and contemplates "light work" (consistent with claimant's RFC as

12  determined by the ALJ).  See AR 19 ("I find that the claimant retains the residual functional capacity

13  to lift and carry 20 pounds occasionally and 10 pounds frequently, stand, walk and sit for 6 hours,

14  and occasionally push, pull, and lift overhead with both upper extremities").

15         Finally, while it is true that the examples of sales clerk jobs cited by the VE require frequent

16  reaching (from 1/3 to 2/3 of the time per the DOT), the VE explicitly took this into consideration by

17  eroding the total number of available jobs by half.  See AR 370 ("some of those sales clerk positions

18  do require reaching up . . . . [s]o I am going to reduce by . . . . 50 percent").  The ALJ, in turn,

19  adopted the VE's findings as to the eroded number of available jobs.  (AR 20).  This process - the

20  consideration of erosion by an ALJ and the use of a vocational expert to clarify the degree of such

21  erosion - was proper.  See Santiago v. Barnhart, 367 F. Supp. 2d 728, 735 (E.D. Pa. 2005)("the ALJ

22  must consider the extent of any erosion of the plaintiff's occupational base [and] '[w]here . . . the

23  extent of erosion of the occupational base is not clear, the adjudicator will need to consult a

24  vocational resource'")(citation omitted); Social Security Ruling 83-12, 1983 WL 31253 (1983)

25  ("Where the extent of erosion of the occupational base is not clear, the adjudicator will need to

26  consult a vocational resource . . . . Vocational experts may testify for this purpose at the hearing and

27  appeals levels").

28  ///

## CONCLUSION

For the reasons outlined above, the Court finds no error in the ALJ's analysis.  As such, the Commissioner's decision to deny disability benefits is supported by substantial evidence in the record as a whole and based on proper legal standards.  Accordingly, this Court DENIES claimant's appeal from the administrative decision of the Commissioner of Social Security.

The clerk of this Court is DIRECTED to enter judgment as a matter of law in favor of defendant Jo Anne B. Barnhart, Commissioner of Social Security, and against claimant Mariam A. Salah.

IT IS SO ORDERED.

Dated:   **April 19, 2006**                               **_/s/ Theresa A. Goldner_**
**j6eb3d**                                                              UNITED STATES MAGISTRATE JUDGE

17